810 A.2d 1

Theresa OTLEY,

v.

Christopher OTLEY.

No. 1266, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Nov. 1, 2002.

542

Alan S. Town, Rockville, for appellant.

Tobey Glee Brehm, Ellicott City, for appellee.

Argued before JAMES R. EYLER, SHARER, and
THEODORE G. BLOOM, (Ret., specially assigned), JJ.

 

JAMES R. EYLER, Judge.

This case presents issues involving marital property and child support. The principal issue is whether corporate stock options that are unexercisable and have no market value at the time of divorce can constitute marital property subject to distribution, by court order, on an if, as, and when basis. We shall answer that question in the affirmative and discuss computation of the marital portion of such options. As a result of our answer to the question, we shall reverse the judgment of the circuit court. We perceive no other error.

## FACTUAL BACKGROUND

On February 3, 2000, Theresa Otley, appellant, filed a complaint for absolute divorce and other relief in the Circuit Court for Montgomery County against Christopher Otley, appellee. Appellee filed a counterclaim for a limited divorce and other relief.

The parties were married on March 23, 1985, and separated on January 23, 2000. The parties have two children, ages 14 and 11.

Appellant has a bachelor's degree and a master's equivalency degree in early childhood special education. During the marriage, appellant was employed by the Montgomery County Public Schools as a special education teacher. In that capacity, appellant worked full time until the birth of the parties' first child in 1988, and thereafter, worked seven-tenths of a full schedule, or 5.6 hours per day.

During the marriage, appellee worked for various employers as a financial control officer. In 1999, appellee began working for Destiny Health, Inc. as financial controller. Pursuant to a written employment agreement, appellee received a salary, bonus eligibility, and stock options, the latter pursuant to a stock option agreement (Option Agreement).

The Option Agreement gave appellee the right to purchase 54,176 shares of stock issued by his employer at $1 per share. The grant of the option to purchase was subject to a vesting

schedule. The Option Agreement provided that the right to exercise an option to purchase 10,000 shares (Founders' Stock Option) was "earned and vested immediately"[1] upon execution of appellee's employment agreement and related documents. Appellee exercised that option in January or February, 2000. The right to exercise the remaining option to purchase 44,176 shares (First Option) was "earned and vested" as follows: twenty-five per cent (approximately 11,000 shares) on July 1, 2000; twenty five per cent on July 1, 2001; twenty five per cent on July 1, 2002; and twenty-five per cent on July 1, 2003. All vested portions of the First Option had to be exercised within thirty days following July 1, 2003, or they were forfeited. As of the time of trial in May 2000, the right to exercise the First Option with respect to the first twenty-five per cent of shares had vested, but appellee had not exercised it. Appellee testified that he had not exercised the right because the fair market value of the shares was approximately fifty cents per share, which was less than the option price.

The Option Agreement also provided that, if employment ceased for any reason, the unexercised but vested portions of the First Option could be exercised for a period of three months after termination, subject to certain specified conditions. In the event of appellee's disability or death, the vested portions of the First Option could be exercised for a period of twelve months following disability or death by appellee's legal representative. The First Option became exercisable in full in the event of a change in control of appellee's employer, as described in the Option Agreement. Finally, the Option Agreement recited that it was binding, and appellee's rights under it could not be assigned or transferred.

At the time of separation of the parties, appellant earned $39,000 per year, and appellee earned a base salary of $107,000 per year. At the time of trial, appellant earned

---

1. The documents relating to appellee's employment use the term "vesting" to refer to the point in time when the right to purchase a specific number of shares could be exercised. We shall use the term in the same sense.

$43,000 per year. Appellee earned a base salary of $113,480 and had recently received a $16,000 bonus.

When the parties separated, they agreed on a division of their then liquid funds. Appellee used $10,000 of those funds to exercise the Founder's Stock Option for 10,000 shares. At the time of separation or soon thereafter, the parties also agreed that they would have joint legal custody of the children and appellant would be the custodial parent, subject to an agreed visitation schedule. On February 1, 2000, appellee began paying appellant $1,346 per month child support, also by agreement.

On October 20, 2000, at the time of the hearing on appellant's claim for pendente lite relief, the court entered a consent order. Pursuant to that order, appellee began paying appellant $2,000 per month alimony and $952 per month child support. At that time or thereafter, the parties agreed that the $1,346 per month previously paid would be treated as alimony for income tax purposes.

On May 2, 2001, open and unsettled issues were tried on their merits, and on August 1, 2001, the court entered judgment. The court granted an absolute divorce, awarded alimony to appellant in the amount of $2,000 per month for 96 months, child support to appellant in the amount of $952 per month, and $3,500 to appellant for attorney's fees. Pursuant to the agreement of the parties prior to trial, the court ordered joint legal custody to the parties, physical custody to appellant, visitation rights to appellee, use and possession of the marital home and personal property therein to appellant for a period of three years, and equal division of marital property. The court stated that, in light of the parties' agreement to divide marital property equally, there was no need to address the question of whether there should be a monetary award.

With respect to the division of marital property, prior to the presentation of evidence, the parties submitted a joint statement of marital and non-marital property. The statement included agreed values for each item of property, except for

appellant's defined benefit pension plan and an item identified as "Destiny Stock Options." Under a column headed "Fair Market Value," the entry for appellant's pension plan and the entry for the stock options was "if, as, when." Of particular significance to this appeal, the court held that "unexercised stock options in Destiny Health Care Inc. are not marital property because no value could be proven at the time of trial."

## ISSUES

Appellant contends that the court erred (1) in holding that the unexercised portions of the First Option had to have value for the court to order distribution on an if, as, and when basis, even though the parties agreed that the option otherwise met the definition of marital property and further agreed to divide marital property on an equal basis; and (2) in not increasing the amount of child support and making it retroactive to the date of filing of the complaint.[2] With respect to the first issue, appellant requests an order that appellant is to receive, on an if, as, and when basis, fifty per cent of any profit realized on shares of stock acquired by appellee pursuant to an exercise of the First Option. With respect to the second issue, arguing that the court did not make appropriate findings, appellant requests that this case be remanded to the circuit court to further address the issue. Appellee filed a cross appeal and contends that the court erred in not making findings with respect to two bank accounts that were first disclosed by appellant during her testimony.

---

2. Appellant, in the last two pages of her brief, mentions alimony and may intend to suggest that the court erred in failing to address whether alimony should be retroactive to the date of filing of the complaint. Alimony is not mentioned in the questions presented or in the heading of the argument. Because we cannot tell whether appellant intended to raise alimony as an issue, we decline to address it. *See* Rule 8–504 and *Beck v. Mangels*, 100 Md.App. 144, 149, 640 A.2d 236 (1994) (The Becks appealed a circuit court ruling that the Mangels had an easement of necessity over their property. This court declined to address five of the eleven points of error raised on appeal because they were not fully presented in appellant's brief.)

## DISCUSSION

### (1)

■ Before further addressing the particular issues herein, we pause to set forth the relevant conceptual framework. When identifying and dividing marital property in a divorce proceeding, a court must follow a three-step process. Md. Code Ann. (1999 Repl.Vol., 2001 Supp.), Fam. Law §§ 8–203— 8–205 (hereinafter FL §§ 8–203—8–205). In the first step, the court determines what property is marital. FL § 8–203. In the event of a dispute, the court makes the final determination. *Id.* In making this determination, the court must consider FL § 8–201(e), which classifies all property acquired during the marriage as marital unless it was given as a gift or inheritance to one spouse, excluded by a valid agreement, or is directly traceable to one of those sources or to property acquired prior to the marriage.

In the second step of this process, the court assesses the value of all marital property. FL § 8–204. Section 8–204(b)(1) of the Family Law article provides that a court "need not determine the value of a pension, retirement, profit sharing, or deferred compensation plan" unless a party has given notice, as required in subsection (2), that the party objects to a distribution on an if, as, and when basis.

Finally, in the third step, the court may transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan, or grant a monetary award, or both, as an adjustment of the rights of the parties. FL § 8–205. In determining the amount and method of payment of an award or terms of transfer of ownership of an interest, the court shall consider the factors set forth in FL § 8–205(b).

In the case before us, the circuit court found that the unexercised portions of the First Option were not "deferred compensation" and did not fall within any of the other exceptions in section 8–204(b)(1). Consequently, the court concluded that it was required to value the option, and because there was no evidence that it had any value, the court could not order its distribution as marital property.

The portion of the court's order addressing the First Option applied to the unexercised right to acquire approximately 44,000 shares. At trial, there was no dispute with respect to the Founders' Stock Option to acquire 10,000 shares, which had been exercised prior to trial. The parties agreed that those shares were marital property. On appeal, appellee concedes that the court erred with respect to the right to acquire approximately 11,000 shares that vested on July 1, 2000. In other words, appellee concedes that the right to acquire those shares constituted marital property, subject to distribution on an if, as, and when basis.

Appellee maintains, however, that the portions of the First Option that had not vested as of the time of trial—the right to acquire the remaining shares (approximately 33,000 shares)—do not qualify as marital property. We address the disposition of the unvested portions of the First Option in the context of the three-step process.

*Step One: Determining What is Marital Property*

This Court considered the question of whether unexercised and unvested stock options can constitute marital property in *Green v. Green,* 64 Md.App. 122, 494 A.2d 721 (1985). The parties disagree with respect to the holding in *Green.* To the extent that *Green* requires clarification, we attempt to do so now.

In that case, the husband had a stock option plan that allowed him to purchase a total of 20,000 shares of his employer's stock exercisable over five years in 25% installments. *Id.* at 131–32, 494 A.2d 721. At the time of exercise, Mr. Green had to be an employee or his employment must have been recently terminated (within ninety days). Prior to trial, Mr. Green had exercised his right to purchase a total of 15,000 shares. *Id.* Of the remaining 5,000 shares, the right to purchase one-half, or 2,500 shares, had vested and could be exercised at the time of trial. The right to purchase the other 2,500 shares could not be exercised at that time, *i.e.,* they were unvested. Mr. Green had to continue to work for his employer in order for the right to purchase the remaining 2,500

shares to vest. Mr. Green's rights in the stock were non-transferable except by will or the laws of intestacy.

In determining whether the option constituted marital property, we first considered whether it was "property." *Id.* at 133, 494 A.2d 721. We determined that stock options, whether vested or unvested, are property because:

> As with pension plans, restricted stock option plans [ ] are a form of employee compensation, providing to the employee the right to accept within a prescribed time period and under certain conditions the corporate employer's irrevocable offer to sell its stock at the price quoted. If the employer attempts to withdraw that offer, the employee has 'a chose in action' in contract against the employer. We therefore conclude that stock option plans, like other benefits in an employee's compensation package, constitute 'property' as used in the definition of marital property.

*Id.* at 136, 494 A.2d 721. Because the option was acquired during the marriage, we concluded that at least some portion of the stock option was marital property under FL § 8–201(e).

■ We see no difference between the unvested and unexercised right to purchase 2,500 shares of stock in the *Green* case, and appellee's unvested and unexercised right to purchase 33,000 shares in the case before us. Despite the fact that appellee has to perform work in the future, after dissolution of the marriage, the option itself was acquired during the marriage. Property includes "obligations, rights and other intangibles as well as physical things." *Id.* at 134, 494 A.2d 721 (citations omitted). In *Green,* we noted that unvested stock options "can be described as the *right to choose* whether or not to purchase" the stock in the future. *Id.* at 137, 494 A.2d 721.

*Green* was decided in 1985. More recently, the Court of Appeals considered a stock option plan and treated it as a type of deferred compensation, as the term is used in section 8 of the Family Law Article. In *Klingenberg v. Klingenberg,* 342 Md. 315, 675 A.2d 551 (1996), a stock option agreement allowed Mr. Klingenberg to purchase 15 shares of stock in the

company that employed him. Although he exercised the option during marriage, the agreement provided that the shares were his exclusively, and it limited his ability to sell the shares on the open market. *Id.* at 321–22, 675 A.2d 551. The employer agreed to repurchase the shares at a generous valuation in the event of Mr. Klingenberg's retirement, death, or disability. Mrs. Klingenberg argued that, because the stock option was deferred compensation, it fell within FL § 8–205, and the court could re-title her portion of the shares in her name. The Court of Appeals decided that the stock option was a type of deferred compensation and remanded the case to the circuit court to address disposition under FL § 8–205. *Id.* at 325, 675 A.2d 551. The Court of Appeals noted that deferred compensation generally means earning money in one year but not receiving that money until a subsequent tax year. *Id.* at 328, 675 A.2d 551. The Court of Appeals reasoned, however, that "while some deferred compensation plans may 'simply delay distribution of cash payments to employees,' a deferred compensation plan may also accomplish other goals, such as tying receipt of the deferred compensation to continued performance by the employee or including covenants not to compete." *Id.* at 328, 675 A.2d 551 (citations omitted). The Court noted that the stock option plan was designed to retain top company officials, and the full value of the plan would not materialize unless the employee remained with the company until retirement. *Id.* at 329, 675 A.2d 551. The Court of Appeals concluded that the stock option plan was a type of deferred compensation contemplated by FL § 8–205. *Id.*

In *Klingenberg,* the option to purchase was exercised during marriage; thus the operative portion of the plan before the Court was the restriction on the transfer of stock. Presumably, the restriction on transfer negatively affected its value. The employer, on the other hand, agreed to pay a generous value if Mr. Klingenberg remained employed until retirement, death, or disability. In the case before us, the transfer of stock was restricted, but it was subject to a right of first refusal by the employer and, if not exercised, by non-selling shareholders. There was no repurchase agreement, and there was no

set price. Despite these differences, our holding in *Green* is consistent with the discussion in *Klingenberg*, and *Green* remains viable. Additionally, as was implied in *Green*, we hold that stock option plans such as those involved in *Green* and in the case before us constitute "deferred compensation" plans within the meaning of FL 8–204(b)(1) and 8–205(b).

We have since distinguished the stock option property rights in *Green* and *Klingenberg* from mere pre-emptive rights, or rights of first refusal, to purchase stock. *Ross v. Ross*, 90 Md.App. 176, 183, 600 A.2d 891 (1992). In *Ross*, we noted that, unlike stock options that are irrevocable offers to sell stock in the future, pre-emptive rights are a "mere possibility or expectancy, contingent upon specified but uncertain triggering events." *Id.* The reason stock options are property interests is precisely because the triggering events are certain. If the spouse works until the triggering date, the right to purchase is irrevocable. In contrast, pre-emptive rights may never vest, regardless of the employee's efforts.

As indicated above, *Green* is controlling with respect to the issue under discussion. We also note, however, that courts in other jurisdictions have frequently held that stock options, even if unvested, constitute property, and at least some portion of such options, if acquired during marriage, constitute marital property. *See Bornemann v. Bornemann*, 245 Conn. 508, 752 A.2d 978, 986 (1998); *In re Marriage of Frederick*, 218 Ill.App.3d 533, 161 Ill.Dec. 254, 578 N.E.2d 612, 618 (1991); *Baccanti v. Morton*, 434 Mass. 787, 752 N.E.2d 718, 727 (2001); *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848, 854–55 (1998); *Salstrom v. Salstrom*, 404 N.W.2d 848, 850 (Minn.App.1987); *Fisher v. Fisher*, 564 Pa. 586, 769 A.2d 1165, 1169 (2001) ("We have independently researched the decisions of our sister states which have decided the issue ... they are unanimous, or nearly so, in treating unvested stock options identically with unvested pensions.... We therefore conclude that ... stock options earned during [the] marriage prior to separation be considered to be marital assets."); *Chen v. Chen*, 142 Wis.2d 7, 416 N.W.2d 661, 663 (App.1987) ("A stock option contract, like an unvested pension, is not a mere

gratuity, but an enforceable contract right.... It is an economic resource, comparable to pensions and other employee benefits, and thus a form of property.").

Additionally, the Internal Revenue Service (IRS) recognizes that a property right exists at the time that the option is granted. *See* 26 U.S.C. §§ 421–424 (2002). Appellee's Option Agreement explicitly defines the options as "intended to qualify as an Incentive Stock Option within the meaning of Section 422 of the Internal Revenue Code of 1986, as amended." Section 422 is a part of Subchapter D: Deferred Compensation and Title II: Stock Options. *Id.* Although the IRS excludes certain income from the exercise of stock options, it recognizes that the initial grant of the option is a property interest. *Id.* Thus, in line with the majority of other states, and consistent with federal tax treatment, we reiterate the holding in *Green* that unexercised and unvested stock options can constitute marital property.

### *What portion is marital* property?

■ We are not finished with step one, however, because a determination that stock options are marital property under FL section 8–203 is only part of the required analysis. While an employee may acquire a stock option during marriage, all of the benefit, *i.e.*, profit, realized from the option will not necessarily be marital property. The non-employee spouse is entitled to an equitable share of only the marital portion of a stock option. *Green* did not discuss this issue, but in holding that unvested stock options can constitute marital property, we analogized to pension plans. Similarly, it is appropriate to analogize to pension plans to determine the marital portion of an unvested stock option.

In a typical situation, assuming that the option is acquired during the marriage, part of the time the employee spouse needs to work in order for an option right to vest will occur during the marriage. If the option has not yet vested at the time of trial, the employee spouse will need to continue to work after dissolution of the marriage to reach the required length of service to trigger the vesting. The combination of

time and events, during and after marriage, determines whether a specific option right has vested.

■ We conclude that the marital portion of unvested stock options can be determined by application of a coverture fraction,[3] just as coverture fractions have been approved for pension assets. *See Bangs v. Bangs,* 59 Md.App. 350, 475 A.2d 1214 (1984). In *Bangs,* we approved the circuit court's use of the following coverture fraction to determine the marital portion of pension assets: time married divided by total years of employment credited toward retirement.[4] *Id.* at 356, 475 A.2d 1214. We reasoned that the court did not err in using this fraction because it separated from the total benefits earned during employment the portion that could be traced to the time the couple was married. *Id.* Because Maryland follows the "source of funds" theory to determine which property is marital, a court must determine when each piece of property is acquired. *Id.* at 363, 475 A.2d 1214; FL § 8–201(e). The "source of funds" theory requires that " 'acquisition' must not arbitrarily and finally be fixed on the date that a legal obligation to purchase is created. Rather, 'acquisition' should be recognized as the on-going process of making payment for acquired property.' " *Bangs,* 59 Md.App. at 363, 475 A.2d 1214 (quoting *Tibbetts v. Tibbetts,* 406 A.2d 70, 77 (Me. 1979), as cited by *Harper v. Harper,* 294 Md. 54, 74, 448 A.2d 916 (1982)).

The marital portion of property should be determined by a trial court in the first instance. It is important to note that the formula approved in *Bangs* was approved with respect to

---

**3.** We indicated as much, via dicta, in *Chimes v. Michael,* 131 Md.App. 271, 276 n. 1, 748 A.2d 1065 (2000) ("the non-vested options will be subject to the same [equitable] division but only after application of a coverture fraction similar to the 'Bangs formula' used for pension assets.")

**4.** The circuit court's total formula was ½ X (Time Married ÷ Total Years of Employment). *Bangs,* 59 Md.App. at 356, 475 A.2d 1214. The " ½" (or other division determined by the circuit court) represents the distribution that takes place in Step Three. The coverture fraction is the part in parenthesis.

the facts in that case, but the same formula is not necessarily applicable to all pension, retirement, profit sharing, or deferred compensation assets. The *Bangs* formula, or a variation thereof, has frequently been used for pension plans when the pension benefit is earned throughout the term of employment.

■ The stock option in this case differs from the typical pension plan in that the asset, the right to purchase, is earned on a specific vesting date. Moreover, continued employment after that date does not determine the value of the asset; its value is determined by other factors. On remand, the circuit court will have to determine the marital portion of the unvested part of the First Option. Generally, the marital portion of the benefit from an unvested option may be determined by comparing (a) the amount of time that the employee spouse was employed, during the marriage and after acquisition of the option, to (b) the amount of time that the employee spouse was employed, beginning with the date of acquisition of the option and ending with the date that the benefit was earned, *i.e.*, vested.

While the methodology for determining the marital portion of an unvested stock option may vary and will be determined by a trial court in the first instance, the following fraction may be a useful guide.

*Term of employment after grant of*
*option and during marriage*

*Term of employment after grant of*
*option until date of vesting*

■ In the case before us, the option was granted on December 12, 1999. The parties were divorced on July 30, 2001. With respect to the First Option, the first 25% was conceded to be marital property prior to trial. The second 25% is also marital property, however, because it vested prior to the divorce decree. The date of divorce is the applicable date for the determination of marital property. *Williams v. Williams*, 71 Md.App. 22, 34, 523 A.2d 1025 (1987).

Applying the coverture fraction described above to the third 25%, the calculation is as follows. The numerator is approximately 1.5 years (December 12, 1999 to July 30, 2001). The denominator is approximately 2.5 years. Consequently, approximately ⅗ or 60% (of the third 25% of the First Option) constitutes marital property. Similarly, if we applied the fraction to the fourth 25%, approximately ³⁄₇ or 43% constitutes marital property.

For purposes of computing the marital portion, we have used the date of vesting as opposed to the date the benefit becomes realizable because the right is earned the day the option vests. Continued employment does not create the asset or directly affect its value. Because most pension plan assets are earned over the entire term of employment, the *Bangs* coverture fraction is appropriate with respect to such assets.

Determining, in step one, the length of time during which the asset was acquired should not be confused with the question of when a benefit becomes realizable under step three of the marital property process. For purposes of steps two and three in the marital property process, a court need not determine, factually, if the distribution will ever occur, or if so, when it will occur.

Treating unvested pension plans and unvested stock options similarly and determining the marital portion of the benefit is consistent with the law in certain other states. *See, e.g., Baccanti v. Morton,* 434 Mass. 787, 752 N.E.2d 718 (2001); *Salstrom v. Salstrom,* 404 N.W.2d 848 (Minn.App.1987); *DeJesus v. DeJesus,* 90 N.Y.2d 643, 665 N.Y.S.2d 36, 687 N.E.2d 1319 (1997); and *Fisher v. Fisher, supra.*

The use of a formula to determine the marital portion of such assets, sometimes referred to as a "time-rule" formula, *see In re Marriage of Hug,* 154 Cal.App.3d 780, 201 Cal. Rptr. 676, 679 (1984), has been approved in several states. Formulas similar to the one we suggest herein have been utilized. *See, e.g., Baccanti, supra; Davidson v. Davidson, supra; Salstrom v. Salstrom, supra; DeJesus v. DeJesus, supra;*

*Fisher v. Fisher, supra; Chen v. Chen*, 142 Wis.2d 7, 416 N.W.2d 661 (App.1987); and *In re Marriage of Miller*, 915 P.2d 1314 (Colo.1996); *see also* 46 A.L.R.4th 640 (1986). When comparing states' laws in this area, however, one must be careful to determine whether a particular state's law is consistent with the general principles that are a part of Maryland law.

### *Step Two: Valuing the Marital Property*

■ Methods of valuation and distribution of marital property vary greatly. At common law, Maryland divorce courts had no power to transfer property. The power now exists, however, with respect to the categories of assets contained in FL 8–204(b)(1) and FL 8–205(b). We have already determined that the unvested stock option in this case falls within one of those categories. With respect to such assets, present value can be determined or the asset can be distributed on an if, as, and when basis. *Deering v. Deering*, 292 Md. 115, 437 A.2d 883 (1981).

■ With respect to present value, as we described in *Green*, "under the second of the three step process for the determination of a monetary award in adjustment of this marital property, the court must attach a value to options as of the date of the decree." *Id.* at 138, 494 A.2d 721 (citing *Nisos v. Nisos*, 60 Md.App. 368, 381–85, 483 A.2d 97 (1984)). Despite the fact that an unvested option has no current monetary value, "it is nonetheless an economic resource, comparable to pension benefits, to which a value can be attributed." *Id.* at 137, 494 A.2d 721. In *Deering*, 292 Md. at 130, 437 A.2d 883, the Court of Appeals noted that present valuation of the future proceeds of deferred compensation can be obtained either by valuing the husband's contributions or the total worth as of the date of trial.[5] "Under [either present-valua-

---

5. The statute at issue in *Deering* was Md.Code (1983), Cts. & Jud. Proc. § 3–6A–05, which was repealed by Acts 1984, ch. 296, § 1, effective October 1, 1984. The relevant contents of Subtitle 6A Property Disposi-

tion] approach, the benefits payable in the future would have to be discounted for interest in the future, for mortality ... and for vesting." *Id.* at 130, 437 A.2d 883 (quoting *Bloomer v. Bloomer,* 84 Wis.2d 124, 267 N.W.2d 235, 238 (1978)); *see also* 46 A.L.R.4th 640 § 6 (1986).

The methods that attempt to assign a present value to future compensation are inherently speculative. We noted in *Green* that other ways to value the stock "tak[e] into consideration the market value of shares of ... stock as of the time of that decree, and the cost to the appellee of exercising the options." *Id.* at 137–38, 494 A.2d 721. This is also known as the "comparable market" approach because it takes into consideration publicly traded stock from the same company. *See Banning v. Banning,* 1996 WL 354930, *2, 1996 Ohio App. LEXIS 2693, *16 (1996); *In Re Marriage of Frederick,* 218 Ill.App.3d 533, 161 Ill.Dec. 254, 578 N.E.2d 612 (1991); *see also* 46 A.L.R.4th 689 (1986). The difficulty of establishing a present value and the fact that the options themselves are usually not divisible or transferable make the if, as and when approach desirable.

Because a stock option plan is a type of deferred compensation, a court need not determine value if distribution is to occur on an if, as, and when basis. FL § 8–204(b)(1). We stated in *Green* that the if, as, and when method of valuation "has proven to be a workable method for the allocation of unmatured pensions ... and, we believe, is equally effective in the allocation of stock options." *Id.* at 138, 494 A.2d 721 (citing *Deering,* 292 Md. at 129, 437 A.2d 883).

We repeat, however, that a determination of the method to use is for the trial court, subject to review on appeal. In *Green,* we noted that even if the parties do not agree on a valuation method, the trial court is free to adopt the if, as, and when approach for "the unexercised options, including the ... matured options as well as the ... unmatured options."

tion in Divorce and Annulment is now contained in Md.Code (1999 Repl.Vol., 2001 Supp.), Fam. Law § 8–201—213.

*Green,* 64 Md.App. at 137, 494 A.2d 721. The if, as, and when method satisfies the valuation step of the analysis.

In the case before us, the circuit court did not need to choose a method of valuation because the parties agreed to the if, as, and when method. Thus, the circuit court erred in stating that, because a dollar value could not be affixed to the First Option at the time of trial, the First Option was not marital property.

### Step Three: Distributing the Marital Property

The final step requires the trial court to equitably distribute all marital property. FL 8–205(a). As we described in *Green,* "the court may, then, pursuant to the third step of the process, determine a percentage by which the profits should be divided if, as and when the options are exercised." *Green,* 64 Md.App. at 138, 494 A.2d 721. This should not be confused with the formula, sometimes appropriate in step one, to determine the marital portion of a benefit. Unlike that mathematical computation, step three requires the court to consider a host of factors in determining how to fairly divide all of the marital property. FL 8–205(b). These factors include "how and when ... [an] interest in the pension, retirement, profit sharing, or deferred compensation plan, was acquired, including the effort expended by each party." FL 8–205(b)(8).

■ Once the court determines how much of the marital asset each spouse should receive, it must order the distribution. The circuit court can "grant a monetary award" as permitted under 8–205(a) for "an adjustment of the equities and rights of the parties concerning marital property," FL 8–205(a), or pursuant to FL 8–205(a), the court can "transfer ownership of an interest in a pension, retirement, profit sharing, or deferred compensation plan from 1 party to either or both parties." Both approaches are valid under 8–205(a), which "gives the circuit court the discretion to transfer an interest in a deferred compensation plan, but does not require it to do so." *Klingenberg,* 342 Md. at 329, 675 A.2d 551.

A direct division or immediate transfer of ownership of an unvested stock option often will present difficulties similar to those encountered with pension assets. It is for this reason that we suggested in *Green* that the if, as, and when approach may be appropriate. Many stock option plans grant the employee the right to obtain shares only at certain times and restrict the transfer of the shares. In the case before us, for example, appellee signed a letter of understanding (Exhibit B to the Option Agreement), which stated that the stock was not registered with the Securities and Exchange Commission. In addition to this restriction, appellee was required to disclose to his employer the terms of any potential third-party sale and allow the employer to exercise its right of first refusal or, if not exercised, offer the stock to non-selling shareholders. (Shareholders Agreement, Exhibit C to the Option Agreement). Consequently, whether all or a portion of a stock option can be re-titled at the time of divorce will be affected by the terms of any and all applicable agreements.

If the ownership interest is transferred under the "if, as and when" method, the applicable employment agreements will affect if and when the benefit is realized. The option agreement in *Green* prohibited the transfer of ownership of the option. We stated:

> The court may not adopt an approach to the equitable adjustment of that property which would operate to compel the appellee to exercise his options, since to do so would in effect deprive him of the essence of his property interest, *i.e.*, the right to make a choice regarding the exercise of the options.

*Green,* 64 Md.App. at 137, 494 A.2d 721.

In step one of the marital property process, for use in determining the marital portion of the unvested portion of the First Option, we suggested the use of a formula tied to the date of vesting. Under step three, utilizing the if, as, and when method, the "if" will not be factually determined until the benefit is realizable (vested), and the "when" will not occur if the option is not exercised. The benefit subject to distribu-

tion, as we stated in *Green* and repeated earlier in this opinion, is the profit, *i.e.*, the difference between (a) the value when realizable and (b) the cost, normally the option price and any costs associated with exercise of the option.

In the case before us, as we mentioned, the circuit court does not have to address step two. Neither does it have to address step three. It must determine what portion of the First Option is marital property as part of step one. The parties have agreed that the marital portion will be distributed on an if, as, and when basis. This satisfies step two, and no valuation is required. With respect to step three, the parties have agreed that the marital portion will be distributed equally between the parties. Consequently, one-half of the marital portion of the First Option benefit will be distributed to appellant on an if, as and when basis.

In addition to the terms of all applicable employment agreements, the nature and type of plan that comes within the categories contained in FL 8–205(b) and the law applicable to each situation will determine the nature of the order required to effect a transfer of an ownership interest in an FL 8–205(b) asset. In this case, on remand, the parties should assist the court in fashioning an appropriate order.

### (2)

Appellant contends that the circuit court erred because it made no findings with respect to the increase in the parties' incomes after the consent order in October 2000; did not articulate any reasons for the court's decision not to increase child support; and failed to address whether it should be retroactive. Appellant asserts, and it is not contradicted by appellee, that the combined incomes of the parties are above guidelines; the highest guideline amount of child support would be $985 per month; and the figure extrapolated from the guidelines would be approximately $1,200 per month. Appellant argues that the court did not have discretion to award less than the maximum under the guidelines ($985), and that the payments should have been retroactive because, pursuant to agreement of the parties, appellee paid virtually

no child support for the period prior to the consent order in October and less than he should have been paying after that.

With respect to these issues, the transcript of the trial reveals the following. The issue that received the most attention was alimony. At the conclusion of evidence, appellant's counsel stated that alimony and child support were related and the court could not determine one without determining the other. Appellant's counsel also stated that the combined incomes of the parties exceeded the guidelines, and the court had discretion to set the amount. Appellant's counsel did not ask for a particular amount and did not ask that it be retroactive. The court, in its oral statements, clearly considered alimony and child support together, and after awarding alimony, stated that it saw no reason to go above the figure of $952 per month in child support, as previously agreed by the parties in the consent order.

In this case, the $952 per month support obligation is $33 lower than the maximum guideline amount of $985. FL § 12–204 states that "if the combined adjusted actual income exceeds the highest level specified in the schedule in subsection (e) of this section, the court may use its discretion in setting the amount of child support." FL § 12–204(d).

In *Voishan v. Palma*, 327 Md. 318, 331–332, 609 A.2d 319 (1992), the Court of Appeals acknowledged that "the guidelines do establish a rebuttable presumption that the maximum support award under the schedule is the minimum which should be awarded in cases above the schedule. Beyond this, the trial judge should examine the needs of the child in light of the parents' resources and determine the amount of support necessary to ensure that the child's standard of living does not suffer because of the parents' separation." In *Voishan*, a case in which the parents incomes were above guidelines, the husband appealed a decision to increase the amount of his child support. *Id.* at 321, 609 A.2d 319. The husband argued that the amount of support could not exceed the maximum amount under the guidelines. *Id.* at 325, 609 A.2d 319. The Court of Appeals disagreed and stated that "[h]ad the legisla-

ture intended to make the highest award in the schedule the presumptive basic support obligation in all cases with combined monthly income over $10,000, it would have so stated and would not have granted the trial judge discretion in fixing those awards." *Id.* at 326, 609 A.2d 319.

The Court of Appeals in *Voishan* further explained that the legislature specifically declined to set guidelines above a certain amount because "the legislative judgment was that at such high income levels judicial discretion is better suited than a fixed formula to implement the guidelines' underlying principle that a child's standard of living should be altered as little as possible by the dissolution of the family." *Id.* at 328, 609 A.2d 319 (citing Attorney General of Maryland's Amicus Curiae brief). The Court of Appeals stated that "[e]xtrapolation from the schedule may act as a 'guide,' but the judge may also exercise his or her own independent discretion." *Id.* at 329, 609 A.2d 319.

In the case before us, the child support guidelines were not applicable. Consequently, the amount of child support rested in the sound discretion of the trial court. Additionally, the determination as to whether child support should be retroactive rests in the sound discretion of the trial court. *See Dunlap v. Fiorenza,* 128 Md.App. 357, 371–72, 738 A.2d 312 (1999); *Krikstan v. Krikstan,* 90 Md.App. 462, 472–73, 601 A.2d 1127 (1992). Because of the rebuttable presumption articulated in *Voishan,* however, it was incumbent upon the court to fully explain the reasoning for its decision as to the amount of child support, because the amount awarded was below the maximum support award under the guidelines.

Because the court did not explain its decision, we vacate the child support award and remand for further proceedings.

(3)

 Appellee asserts that appellant, while testifying, revealed that she had two bank accounts that had not been previously disclosed and that contained $8635. Appellee contends that the court erred in not including the accounts as

marital property, subject to equal distribution in accordance with the agreement of the parties.

The circuit court did not make any findings with respect to these accounts. The court was advised by the parties that they had reached agreements with respect to certain property, and the parties made no arguments with respect to the accounts in question. There was no evidence with respect to the source of funds in the accounts except that $3,000 was a gift or loan from appellee's mother and some of the money may have come from support payments by appellee. It appears that appellee had a checking account that was also not addressed by the court. In light of the failure of appellee (1) to present evidence to establish that the funds were marital property, (2) not excluded by agreement (*see* FL § 8–201(e)(3)(iii)), and (3) to argue his position to the trial court, we perceive no error.

**PORTION OF JUDGMENT PROVIDING "ORDERED, THAT THE COURT FINDS THAT DEFENDANT'S UNEXERCISED STOCK OPTIONS IN DESTINY HEALTH CARE, INC. ARE NOT MARITAL PROPERTY BECAUSE NO VALUE COULD BE PROVEN AT THE TIME OF TRIAL" IS VACATED. PORTION OF JUDGMENT AWARDING CHILD SUPPORT VACATED. JUDGMENT OTHERWISE AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**