814 A.2d 65

Alyson Victoria SMITH,

v.

Antonio Michael FREEMAN.

No. 01583, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Dec. 26, 2002.

2

**4**

David P. Sutton, Baltimore, and Ralph W. Powers, Jr., Upper Marlboro, for appellant.

Bonnie J. Butler (Butler & Robinson, P.A., on the brief), Baltimore, for appellee.

Argued before HOLLANDER, SALMON and PAUL E. ALPERT (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This appeal arises from a request for modification of child support filed by Alyson Victoria Smith, appellant, against Antonio Michael Freeman, appellee. The parties, who were never married to each other, are the parents of five-year-old Gabrielle Marie Smith Freeman. In essence, the dispute centers on the question of an appropriate child support award when: 1) the non-custodial parent is a wealthy professional athlete whose current salary far exceeds the maximum income to which the child support guidelines apply, but whose career expectancy is limited; 2) the parties were never married to each other; and 3) the wealthy father has provided substantial support pursuant to an agreement, in an amount that exceeds the child's day-to-day expenses, but his income has grown substantially since the parties reached that agreement.

On October 1, 1998, the Circuit Court for Anne Arundel County entered a consent order that resolved issues related to child custody and visitation. Shortly thereafter, the parties reached an agreement concerning child support; among other things, appellee agreed to pay $3500 a month to appellant. At that time, appellee earned an annual salary of about $1.2 million as a football player with the Green Bay Packers.[1] Two years later, when appellee's annual salary soared to $3.2 million, appellant sought an increase in child support. After a hearing in July 2001, the circuit court rejected appellant's position that she is entitled to an increase in child support

---

1. Appellant now plays for the Philadelphia Eagles. The record does not contain information as to appellee's salary with the Eagles, however.

even though appellee's income has tripled. It concluded that there has been no change in the child's needs, and therefore appellant is not entitled to an increase in child support.

This appeal followed, in which appellant presents two questions for our consideration:

I. Whether the circuit court abused its discretion in holding that a large increase in the income of the father, a professional athlete, did not warrant an increase in child support.

II. Whether, in denying the increase, the circuit court misapplied the legal standards relating to the child support obligations of a high income parent with a vast wage increase in the course of a short career expectancy.

For the reasons discussed below, we shall vacate the circuit court's order and remand for further proceedings.

## FACTUAL SUMMARY

Gabrielle was born to the parties, out of wedlock, on March 13, 1997. Although the parties share joint legal custody, appellant has primary physical custody of the child. Appellant is currently married and has another daughter.[2]

There is no suggestion that appellee has been a proverbial "deadbeat dad." To the contrary, pursuant to an agreement between the parties dated November 20, 1998 (the "Agreement"), appellee assumed responsibility for the financial support of Gabrielle. At the time, appellee earned an annual salary of $1.2 million, and he agreed to pay $3500 per month in child support until the child reaches the age of eighteen. In addition, appellee agreed to pay for Gabrielle's private school education through twelfth grade, inclusive of any attendant costs, such as uniforms and books; health insurance until Gabrielle reaches the age of twenty-one; all health care expenses not covered by insurance, such as orthodontia; and

---

2. Although appellant now uses the name of Alyson Victoria Smith–Stevens, we shall refer to her by the name that appears on her brief.

to establish a college fund of at least $100,000, through four successive annual payments of $25,000, with the first payment due in 1998. Freeman also agreed to secure a life insurance policy of $500,000 for the benefit of Gabrielle, designating her as the sole irrevocable beneficiary, with the funds to be used for the support of the child in the event of appellee's death. Further, appellee agreed to a one-time provision of a car to appellant, valued at $17,500, so that appellant could safely transport Gabrielle.

On October 10, 2000, some two years after the parties executed the Agreement, appellant filed the motion to modify child support. Claiming that appellee's income had climbed to about $3.2 million per year, she sought an increase in support.

At the motion hearing held on July 9, 2001, the parties proceeded largely by stipulation and argument, with brief testimony from appellant. They stipulated that, when the Agreement was executed, appellee was earning about $1.2 million, and that his income subsequently increased to $3.2 million. In addition, the parties stipulated that the Green Bay Packers had the right to "cut him this season if he doesn't perform or if he gets hurt." In that event, according to appellee, his salary would revert to $1,000,000. Further, the parties agreed that appellee enjoyed a gross monthly income of $258,000.00.[3] On an annual basis, appellee's monthly child support payments of $3500 amounted to $42,000. Coupled with appellee's monthly payment of $516.66 for tuition, Freeman had a combined monthly child support expenditure of $4016.66.

Further, the parties agreed that appellant was attending school and was unemployed. Appellant's financial statement showed that the child support payments were her only source of income.[4] On her financial statement, appellant listed the

---

3. We recognize that, when annualized, $258,000 per month is less than $3.2 million. Nevertheless, appellee's lawyer represented that appellee's annual income is $3.2 million.

4. We have not been provided with any information as to the income of appellant's husband.

following monthly expenses for Gabrielle, some of which represented the child's pro rata share: Mortgage—$700 [5]; Utilities—$250; Telephone—$100; Food—$300; Clothing—$900; Medical and Dental—$350; Transportation—$400; Life Insurance—$75; Health Insurance—$50; Auto Insurance—$50; Child Care Expense—$497; Recreation—$750; and Incidentals—$500. Thus, appellant claimed total monthly expenses for Gabrielle of $4592, or $55,104 per year.

Appellee's counsel asserted that Mr. Freeman had been supporting his daughter generously. She claimed that, if the court were to increase the amount of child support, appellee would actually be "supporting the mother...."

The court found a material change of circumstances based on appellee's increase in income since 1998. The court said:

All right, well let me say the Court has already, from the discussions with counsel in chambers, been giving this issue some thought and it does seem to me that there is no doubt but that there is a material change of circumstances in that Mr. Freeman's income has tripled.

Nevertheless, in an oral opinion, the court denied appellant's request for a modification of child support. The court's decision was predicated on several grounds.

The court observed that, at the "top" of the Guidelines, for one child, the maximum amount of monthly child support was $1040, exclusive of additional entitlements for certain extra expenses, such as child care. Thus, it pointed out that appellee was currently paying more than double that amount, pursuant to "a very generous [A]greement." The court was also satisfied that the Agreement "provides for the full needs" of the child. Recognizing that it had discretion with regard to the child support award, the court considered the issue of the child's needs as the proper "approach" to determine the amount. It said:

5. Appellant's total monthly mortgage payment was $3410, of which $700 was attributed to Gabrielle.

Now, under the case law, once you get to the top of the [Guidelines] chart, it is in the Court's discretion as to whether it would be in the best interest of the child to go above and beyond that and in [*Voishan v. Palma*], they suggest ways that the Court could approach it and *obviously one of the ways the Court could approach it is in a financial statement, a statement of needs for the child.*

(Emphasis added).

In addition, the court attached weight to the parties' 1998 Agreement, despite the fact that appellee's income had almost tripled since the time that the Agreement was executed. The court said:

Even though the Court may find that it is off the chart, I think it is a factor for the Court to consider which is the terms of the parties' agreement. We start with a presumption that when the parties' make an agreement, that their agreement is reasonable and in the best interest of the child. I have reviewed the agreement in this case. The agreement is one which makes many provisions, including for trust funds for the child for education, including the payment of uninsured health costs and it is a very extensive and very well thought out agreement and it is difficult for me to say that it, per se, is not in the child's best interest.

Focusing again on the child's needs, the court also said:

The argument could be made on a policy basis that if one parent has income which is rising substantially, that as the saying goes, when the tides rises, all boats are lifted, that the child should benefit automatically simply because one parent's income has risen substantially.

However, I think that there is also the countervailing argument on the other side, as expressed by [appellee's attorney], that *the point of child support is to take care of the needs of the child and not necessarily to take care of the needs of any other member of the household where the child lives.*

(Emphasis added).

With regard to the child's expenses and needs, the court was of the view that certain expenses claimed by appellant

were excessive or unnecessary, notwithstanding Gabrielle's status as the daughter of an acclaimed and wealthy football player. The court said:

So that brings me to the financial statement which is Exhibit 1 and I see in this financial statement that it does have the statement of the child's needs. It is always a difficult matter to say of a house payment how much should be attributed to a child, so I have no problem with $700 for that. I have no problem with utilities, the telephone, the food. I do have a question about the clothing. Nine hundred dollars per month for clothing is an amazing amount of clothing for a four-year old child. It is an amazing amount for a grown-up unless the grown-up is someone who either walks over hot coals and has their clothes burned off them daily, or unless it is someone whose whole job relates to fashion and constantly being well dressed.

For a child—most children, $900 per year would probably be sufficient. So I think that is, clearly on the face of it, grossly excessive. The medical, dental, and health insurance amounts, I think, are clearly erroneous as $400 because those are all provided by the father under the terms of the agreement and therefore it should be an add on to the support which is not the support itself, but an amount that he separately pays.

\* \* \*

In terms of child care, again, under the statute, the child care expense has to be work related and since Ms. Stevens is not working, that is another $500 that is at issue. So if I assume say $100 for clothing expenses plus $400 for the medical plus $500 for the child care, that already brings the financial statement for actual need for the child down to approximately $3,500 and I think there are also issues that are presented in terms of recreation, $750 per month, again, that is, I think, excessive, and would obviously be something that the Court would not buy for a child, almost any child.

So I think that basically, with those concerns about the financial statement, even as submitted, the Court would not

be able to find that the financial statement, in itself, justified an increase.

In regard to the mother's contention that she was entitled to an increase in child support because the father's income had almost tripled, the court disagreed. It indicated that, regardless of appellee's income, $42,000 a year in child support was sufficient. The court said:

> The Court has difficulty in saying that over $40,000 per year is a standard of living so impoverished that there is automatically a need for someone from a household with that standard of living to have an increase in order not to feel like the neglected step child in going to a more wealthy household.

The court also expressed concern that any increase in child support would really inure to the mother's benefit, rather than to the child. Put another way, the court seemed to believe that the mother and other members of her family would personally benefit from additional support for Gabrielle, because they would all share in the child's luxurious lifestyle. In this regard, the court said:

> [I]f I take the total amount of support that is coming into the mother's home, it is $3,500 times twelve, that's $42,000 per year, theoretically Ms. Stevens should be getting back to work. She is imputed to have an ability to support herself, I have no reason to think she is not able to. If the Court were to grant the suggestion of a percentage of, what, five percent of Mr. Freeman's ongoing income, that would be $165,000 per year, roughly, and if that was the income that the Court put into the home, and assuming that it was available on a continuing basis, I would see no incentive for Ms. [Stevens] or anyone in her household ever to work and I don't know that I could say that it was in the best interest of the child because one member of the family is, at the moment, very wealthy, that everyone that has anything to do with the child should be equally living a lifestyle of luxury.

* * *

Moreover, because that amount, $165,000 per year, would to the Court's mind, be grossly excessive, it would have the effect of putting extra money into the hands of Ms. Stevens which she would most appropriately hold in trust for the child at some point in the future. However, it was the parties' agreement that if a trust fund was going to be set up, that it should be—it was going to be set up by Mr. Freeman.

Further, the court noted that, because the parties had never been married to each other, the child was accustomed to the parents' varying standards of living. It said:

This is not the situation that the Court of Special Appeals considered in the case of *Melrod v. Melrod,* where it was a family unit and the parties had been married and the child had a standard of living that was now being disrupted so that it was a change for the child to have to deal with going from what she was used to, to going to relative poverty. *This is a child that never had lived in a household that was one with that standard of living, rather she always has had parents with different lifestyles and different standards of living.*

(Emphasis added).

In addition, the court was of the view that the tenuous nature of appellee's employment militated against an increase in child support. The court reasoned:

[T]he Court—perhaps I shouldn't, but will take notice of the nature of employment that Mr. Freeman has. There is no question but that he is a professional football player and what I will take notice of is that professional football players don't have those careers for 25 to 30 years as [do] most normal people who have reached the peak of their employment capacity.

If Mr. Freeman were a CPA, a lawyer, a brain surgeon, maybe he would have a high income in six figures if he were at the top of that profession and maybe that would continue for 20 or 30 years, therefore, it might make more sense to have there be an ongoing adjustment. However, since as

we know professional football players peak out and must retire, and sometimes unexpectedly retire with serious injuries that may make them physically disabled for the rest of their lives, they may never be able to work again and have any kind of significant employment. It may be that Mr. Freeman is in the position where he needs to be holding a substantial part of his earnings in trust for himself against the day when he may be totally unemployable.

Therefore, the Court thinks that requiring him to give up a part of the funds that he may need to hold in trust for himself for future period[s] of unemployment or disability, is not something that necessarily is in the best interest of the child when there already is a very generous agreement that the parties have reached and that provides for the full needs that the Court has found are reasonable in light of its own revision of what Ms. Stevens has submitted as Exhibit 1.

So for that reason, the Court would be inclined, based on the parties' stipulation and argument, to deny the motion for increase. . . .

Thereafter, the court permitted appellant to present testimony as to the child's expenses. The following colloquy is relevant:

[APPELLANT'S ATTORNEY]: . . . I have shown you a copy of what has been marked as Plaintiff's Exhibit No. 1 and we have as an amount under clothing, $900. Can you explain that in detail, Ms. Stevens, why $900 for Gabrielle per month.

[APPELLANT]: The breakdown would be actual clothing that she plays in, wears to school, shoes and costumes for her activities and dry cleaning.

[APPELLANT'S ATTORNEY]: Approximately how much of that is for shoes?

[APPELLANT]: Shoes? I would probably say about on the average of about $100 to $150 per month.

[APPELLANT'S ATTORNEY]: And your testimony is that you need $100 to $150 per month for shoes?

[APPELLANT]: Yes.

[APPELLANT'S ATTORNEY]: And that seems like— that's 12 pairs of shoes a year or so, maybe more, why would you have so many shoes for Gabrielle?

[APPELLANT]: Well, first of all because she's growing, second of all because good shoes cost a considerable amount of money. . . .

[APPELLANT'S ATTORNEY]: All right, and with regard to the types of shoes, do you have to have more than one type? . . . .

[APPELLANT]: [S]he has everything from sandals to tennis shoes, she has her baton shoes, ballet slippers, dress shoes for church.

\* \* \*

[APPELLANT'S ATTORNEY]: All right, now with regard to the other clothing, would you tell His Honor what other clothing you have to buy and roughly go through the expenses per month.

[APPELLANT]: A typical month, usually jeans, dresses, depending on whether it is summer or winter, swim suits or heavy coats and underclothes, things like that.

[APPELLANT'S ATTORNEY]: Can you give us a breakdown on the kinds of clothing that you buy and what it cost you to buy those per month.

[APPELLANT]: Mostly, pant sets and dresses, dresses for church, or for pictures or more special things and I buy her a lot of pant sets so she can run around and play. Typically, I purchase things from Gymboree or Gap, sometimes Old Navy, but an outfit, just a regular outfit at Gymboree, on an average, a sweater, shirt or a pair of little tights runs probably $60 or $70.

[APPELLANT'S ATTORNEY]: Okay, and how many times a month do you need to buy that or how much per month would you spend on the jeans, dresses, and pants?

[APPELLANT]: Jeans, dresses and pants? Probably at least $400.

\* \* \*

[APPELLANT'S ATTORNEY]: What do you have in addition to that, Ms. Stevens?

[APPELLANT]: Like I said, costumes for her events, shoes for her events, anything additionally that she wants, that she sees that she wants, I will get it for her, and then—

\* \* \*

[APPELLANT'S ATTORNEY]: What other costs do you have besides the costumes for baton, as far as clothing is concerned?

\* \* \*

[APPELLANT]: Other than regular clothing, like I said, coats, maybe boots, just anything, it depends on what the season is, but things outside of regular clothing would be swimsuits or coats or things of that nature, hats, and then the costumes, like the baton costumes range, it could be as cheap as $50, it could be as expensive as $500. . . .

[APPELLANT'S ATTORNEY]: And how many costume[s] do you have to buy her per month?

[APPELLANT]: It depends on the different routines she has. It could be as little as one, as much as three, it depends.

\* \* \*

[APPELLANT'S ATTORNEY]: Okay, and the coats and boots that you have to buy in the winter, are they more expensive?

[APPELLANT]: The coats are.

[APPELLANT'S ATTORNEY]: What do you pay in the winter months for coats and boots?

[APPELLANT]: For a nice coat, probably at least $100. Boots, maybe $40 to $60 if they are nice boots, not snow boots.

\* \* \*

[APPELLANT'S ATTORNEY]: All right, are there any— as far as the—wait, I'm sorry, Your Honor, strike that, let me—as far as child care expenses, are there—are you incurring child care expenses now?

* * *

[APPELLANT]: Okay, I originally planned on starting back in April. I will be starting part time very soon working around my school schedule which begins again in August, but before I go back to school, I will start working, using my real estate license to try and generate some income. So that is a cost that I will have in the very near future for work related reasons.

* * *

[APPELLANT'S ATTORNEY]: And with regard to incidentals, what is included in incidentals on your financial statement?

[APPELLANT]: Basically anything that she might want or a place that she might want to go. Not like a vacation, but like, for instance, maybe the N'Sync concert, we're going to the N'Sync concert in August, things like that, places like that, places that she might want to go, things she might want to do, birthday parties for her friends or maybe for herself, things like that.

[APPELLANT'S ATTORNEY]: Are there any activities, educational activities included?

[APPELLANT]: Yes.

[APPELLANT'S ATTORNEY]: And what kind are they?

[APPELLANT]: Museums, things of that nature, any kind of exhibits, maybe an art exhibit. We do different things, it depends.

* * *

[APPELLANT'S ATTORNEY]: All right, and with regard to recreation, you have an entry for recreation. What is included in recreation?

[APPELLEE'S ATTORNEY]: I thought that was part of incidentals, Your Honor.

[APPELLANT'S ATTORNEY]: They are two different categories.

[THE COURT]: It's a separate category, the total is $1,250.

[APPELLANT]: Recreation, that kind of falls into whatever she wants to do or maybe a place that I might want to take her, like a short trip.

[APPELLANT'S ATTORNEY]: Does that also include her activities?

[APPELLANT]: Some. We got [sic] to the movies a lot.

\* \* \*

[APPELLANT'S ATTORNEY]: Ms. Stevens, is this financial statement accurate based on what you need for Gabrielle?

[APPELLANT]: Yes, I would say so.

The court indicated that it did not believe appellant's testimony as to some of the child's expenses. As to other expenses, the court considered many of them excessive and unreasonable. It said:

> Let me say that although there was some more specifics provided, that nothing in the testimony from Ms. Stevens really substantially changed the Court's understanding of the way that these expenses are incurred and the need for them. As to clothing, as to none of it were there any receipts, although [appellant's attorney] said something about receipts, none were offered. Ms. Stevens said she has them at home, that is not the place to have those receipts if you are coming to court.

> As to clothing, she says anything she sees that she wants I'll get it for her and then we heard testimony that there is clothing that is bought that she doesn't wear, four pairs of shoes per month, I, A, still can't believe that that is $900 per month, and B, can't believe it is in the best interest of the child to be able to get anything that she sees that she wants. I think that is a horrible way to raise a child and moreover, I'm not even a hundred percent sure that she's doing that.

> The child care is not currently being incurred. Ms. Stevens said things like it is possible in the near future that we are going to do that, now we don't in the summer, it's possible I'm going to be going back to school. On the other hand, she might be going to school instead of day care. If

she goes to school instead of day care, Mr. Freeman is going to be directly on the hook for that under the parties' agreement, so again, it is speculative and I don't find that that is an actual expense currently being incurred. As to recreation, I'm in no way convinced that the expenses are any where close to as high as she testifies. The only way that they could get there would be if she buys her, even during the off season, multiple twirling costumes per month and some of them would have to be in the multi-hundred dollar range, and again, I can't see how that is appropriate for a four-year old child and in her best interest.

As to health insurance, there is no actual incurring of that cost because she's got a family plan that her husband would already be paying for the rest of the family, so there is no cost for this child.

\* \* \*

So for all those reasons, I don't see that the additional evidence makes any difference from what the Court provisionally had found to be appropriate and in the child's best interest. So I would still deny the request for increase considering all that evidence.

Accordingly, by Order dated August 27, 2001, the court denied appellant's request for a modification of child support, stating that "the current child support order in the amount of Three Thousand Five Hundred Dollars ($3,500) per month will remain in effect and the Defendant will continue to pay other expenses as agreed upon; . . . ."

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Appellant contends that the circuit court applied an incorrect legal standard in resolving the motion to modify child support. Further, given the substantial increase in appellee's annual salary, from $1.2 to $3.2 million, she maintains that the court abused its discretion in refusing to in-

crease appellee's child support obligation. According to appellant, "[t]he Court's holding flatly contradicts the basic principle that a child is entitled to share in a parent's affluence and good fortune." Appellee counters that "the court, within its discretion, properly concluded that the minor child's needs were being met under the existing child support award and that no modification was necessary."

Preliminarily, we pause to review the legislative child support scheme. To comply with federal law, the General Assembly enacted Maryland's Child Support Guidelines (the "Guidelines") in 1989. *See* Maryland Code (1999 Repl.Vol.), § 12–201 et. seq. of the Family Law Article ("F.L."). The Guidelines went into effect on the date of enactment, because the General Assembly regarded the legislation as " 'necessary for the immediate preservation of the public health and safety . . . .' " *Jackson v. Proctor,* 145 Md.App. 76, 89, 801 A.2d 1080 (2002) (citation omitted); *see Petrini v. Petrini,* 336 Md. 453, 460, 648 A.2d 1016 (1994); *Voishan v. Palma,* 327 Md. 318, 322, 609 A.2d 319 (1992); C. Nicholson & C. Little, *Past, Present and Future Child Support Guidelines in Maryland,* MD. BAR J., May/June 2002, at 41, 42.

The Guidelines reflect a legislative attempt 1) "to 'remedy a shortfall in the level of awards' that do not reflect the actual costs of raising children; 2) to 'improve the consistency, and therefore, the equity of child support awards,' and 3) to 'improve the efficiency of court processes for adjudicating child support.' " *Voishan,* 327 Md. at 322, 609 A.2d 319 (citation omitted). Moreover, "[t]he guidelines are premised on the concept that 'a child should receive the same proportion of parental income, and thereby enjoy the same standard of living, he or she would have experienced had the child's parents remained together.' " *Allred v. Allred,* 130 Md.App. 13, 17, 744 A.2d 70 (2000)(quoting *Voishan,* 327 Md. at 322, 609 A.2d 319).[6] Using the Income Shares Model, the Guide-

---

6. We note that no evidence was presented as to appellee's standard of living or lifestyle. Neither side has raised any issue as to appellee's lifestyle, however.

lines establish "child support obligations based on estimates of the percentage of income that parents in an intact household typically spend on their children." *Voishan*, 327 Md. at 322–23, 609 A.2d 319.

To further the purpose of the Guidelines, their use is mandatory *if* the parents have a monthly combined adjusted income of $10,000 or less. *Wills v. Jones*, 340 Md. 480, 484, 667 A.2d 331 (1995); *Voishan*, 327 Md. at 331–32, 609 A.2d 319; *Horsley v. Radisi*, 132 Md.App. 1, 24, 750 A.2d 692 (2000). When, as here, the parents' combined monthly income exceeds $10,000, the Guidelines do not apply. *Barton v. Hirshberg*, 137 Md.App. 1, 17, 767 A.2d 874 (2001). Rather, in an "above Guidelines" situation, the statute confers discretion on the trial court to set the amount of child support. *See* F.L. § 12–204(d); *see Voishan*, 327 Md. at 324, 609 A.2d 319; *Otley v. Otley*, 147 Md.App. 540, 561–62, 810 A.2d 1 (2002); *Collins v. Collins*, 144 Md.App. 395, 442, 798 A.2d 1155 (2002); *Bagley v. Bagley*, 98 Md.App. 18, 39, 632 A.2d 229 (1993), *cert. denied*, 334 Md. 18, 637 A.2d 1191 (1994). As we said in *Chimes v. Michael*, 131 Md.App. 271, 748 A.2d 1065, *cert. denied*, 359 Md. 334, 753 A.2d 1031 (2000), " 'the Legislature left the task of awards above the guidelines to the Chancellor precisely because such awards defied any simple mathematical solution.' " *Id.* at 289, 748 A.2d 1065 (citation omitted).

When the statute and the case law speak of the inapplicability of the Guidelines to cases involving monthly parental income of more than $10,000, it is clear that they mean that the numerical component of the Guidelines does not apply. We underscore that, even in an above Guidelines case, "[t]he conceptual underpinning" of the Guidelines applies. *Voishan*, 327 Md. at 322, 609 A.2d 319. As we said earlier, the Guidelines are founded on the premise "that a child should receive the same proportion of parental income, and thereby enjoy the standard of living, [that] he or she would have experienced had the child's parents remained together." *Id.* That rationale is no less applicable here, merely because this is an above Guidelines" case.

*Voishan* also suggests that, in an above Guidelines situation, the maximum support under the Guidelines is ordinarily the starting point with regard to an appropriate child support award. *Id.* at 325, 609 A.2d 319 (rejecting father's position that a " 'reasonable approach' would have been for the trial judge to assume that the maximum basic child support obligation listed in the schedule ... applies to those [with income] in excess of $10,000 per month"). Thus, the foundational concept that child support should be in an amount consistent with the parents' standard of living cuts across all economic lines, whether the parents are poor or wealthy.

When the chancellor exercises discretion with respect to child support in an above Guidelines case, he or she "must balance the best interests and needs of the child with the parents' financial ability to meet those needs." *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986); *see Collins,* 144 Md.App. at 443, 798 A.2d 1155. Several factors are relevant in setting child support in an above Guidelines case. They include the parties' financial circumstances, *Unkle,* 305 Md. at 597, 505 A.2d 849, the "reasonable expenses of the child," *Voishan,* 327 Md. at 332, 609 A.2d 319, and the parties' " 'station in life, their age and physical condition, and expenses in educating the child[ ].' " *Id.* at 329, 609 A.2d 319 (citation omitted). We will not disturb the trial court's discretionary determination as to an appropriate award of child support absent legal error or abuse of discretion. *Ware v. Ware,* 131 Md.App. 207, 240, 748 A.2d 1031 (2000).

This case concerns a request to modify child support. Pursuant to F.L. § 12–104(a), "[t]he court may modify a child support award ... upon a showing of a material change of circumstance." The statute does not define the concept of "a material change in circumstance," however. Rather, the meaning of that concept has been elucidated in several appellate decisions. In particular, the case law has established that, for purposes of the modification of child support, a material change in circumstances may be based either on a change in "the needs of the children *or in the parents' ability*

*to provide support."* *Unkle,* 305 Md. at 597, 505 A.2d 849 (emphasis added); *see Drummond v. State,* 350 Md. 502, 509–10, 714 A.2d 163 (1998); *Wills,* 340 Md. at 488–89, 667 A.2d 331; *Wagner v. Wagner,* 109 Md.App. 1, 43, 674 A.2d 1, *cert. denied,* 343 Md. 334, 681 A.2d 69 (1996). Moreover, the term "material" has been construed to "limit[ ] a court's authority to situations where a change is of sufficient magnitude to justify judicial modification of the support order." *Wagner,* 109 Md.App. at 43, 674 A.2d 1 (footnotes and citations omitted).

■ Nevertheless, a material change in circumstances does not necessarily compel a modification. Rather, a decision regarding modification is left to the sound discretion of the trial court, so long as the discretion was not arbitrarily used or based on incorrect legal principles. *See Moore v. Tseronis,* 106 Md.App. 275, 281, 664 A.2d 427 (1995).

■ We emphasize, however, that the case law indicates that the modification standard is a disjunctive one. Therefore, a court may modify child support based on one of two alternative grounds, i.e., a change in needs *or* a change in parental resources. As the Court said in *Drummond,* 350 Md. at 510, 714 A.2d 163, a "relevant change in circumstance may occur when there is a change in the income pool [of a parent] used to calculate the child support obligation."

Here, the court found a material change in circumstances based on the father's $2 million increase in his annual salary, which occurred subsequent to the original child support Agreement. Appellee has not challenged the court's finding of a material change in circumstance based on his income. Therefore, that finding is not before us.

## II.

Although the court below found a material change of circumstances based on the father's increase in income—one of the two alternative prongs specified above—it declined to modify the child support award, because of the absence of a change in the child's needs. The court rejected many of appellant's expenses for the child, either because the court did

not believe appellant really spent as much as she claimed, or because the court regarded the expenditures as completely unnecessary and inappropriately excessive and indulgent. Accordingly, despite the court's finding that appellee's income had increased substantially, the court denied appellant's requested modification, based on the absence of a change in the child's needs.[7]

For the purposes of our analysis, we accept the court's factual finding that there was no change in the child's needs. Nevertheless, as we have observed, the standard for a modification of child support is a disjunctive one. Therefore, in the court's discretion, child support was subject to modification based on a change in the child's needs *or,* alternatively, a change in the parent's economic resources. In other words, because the court expressly found a substantial increase in the father's economic resources, the court, in its discretion, could have determined to modify child support based on that change alone, notwithstanding the lack of change in regard to the child's needs.

Based on our review of the court's ruling, however, we are unable to determine if the court recognized the disjunctive nature of the standard applicable to a motion for modification of child support. Although the court found a material change of circumstances based on appellee's income, it never articulated the elements of a material change in circumstance. Nor did it acknowledge that a substantial change in income, by itself, could support a modification. Moreover, the content of the court's oral ruling suggests that the court may have believed that the modification standard is a conjunctive one, so as to require appellant to demonstrate both a change in financial circumstances *and* a change in the child's needs.[8]

---

7. Our point is illustrated by considering the converse situation. If a parent's income plummets, he or she may well be entitled to a reduction in the child support obligation, even when there is no corresponding reduction in the child's needs. In the same way, an increase in support may be warranted based on an increase in income.

8. In his concurring opinion, Judge Alpert points out that the trial judge is presumed to know the law. That legal principle is not applicable

Even if we perceived the court's opinion as having recognized the disjunctive elements of the modification standard, the court's opinion seems to indicate that the court regarded need as a paramount factor. Crediting what it called the "countervailing argument," the court said that "the point of child support is to take care of the needs of the child...." This language suggests that the court considered dispositive its finding as to the absence of any change in the child's needs. While the lack of change in the child's needs could have supported the court's discretionary decision not to increase child support, it did not compel the court to reach that result.

 A child is entitled to a standard of living that corresponds to the economic position of the parents. As the Court said in *Voishan,* 327 Md. at 322, 609 A.2d 319, a child should enjoy "the same proportion of parental income, and thereby enjoy the standard of living, he or she would have experienced had the child's parents remained together." That principle applies even in an above Guidelines case. *See, e.g., Ware,* 131 Md.App. at 240–41, 748 A.2d 1031 (upholding a child support award even though the wife had a "surplus of income" on a monthly basis and the child had "no unmet needs"); *Bagley,* 98 Md.App. at 35, 632 A.2d 229 (concluding, in an above

---

here, however, because we cannot give the trial judge the benefit of the doubt at the possible expense of the child. *Cf. Lemley v. Lemley,* 102 Md.App. 266, 295, 649 A.2d 1119 (1994) (stating that, "[i]n light of the complexity of the issue" regarding a monetary award, this Court was "unwilling to presume [from the chancellor's silence that] the chancellor properly considered" husband's contributions to the marital home). Moreover, this is not a case in which the record shows, with "unmistakable clarity," that the court applied the disjunctive standard. *See Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583 (1976).

As we noted, the judge focused on a needs analysis, without acknowledging that the change in the father's economic position could, by itself, support a modification. Yet, many of the cases that have applied the presumption have done so when the judge was silent as to an issue. Because this is not a case in which the trial judge was merely silent as to the applicable law, the presumption is rebutted. *See, e.g., Ball v. State,* 347 Md. 156, 206, 699 A.2d 1170 (1997) (recognizing that a judge is presumed to know the law, so long as "[n]othing in the record suggests otherwise"), *cert. denied,* 522 U.S. 1082, 118 S.Ct. 866, 139 L.Ed.2d 763 (1998).

Guidelines case, that child support award was not "consistent with the principles underpinning the guidelines.")

Numerous cases from other jurisdictions recognize that an increase in parental income alone may justify an increase in child support, even when there is no change in a child's needs. For example, in *Smith v. Stewart*, 165 Vt. 364, 684 A.2d 265 (1996), an above Guidelines case, the court clearly refuted the notion that the amount of child support is necessarily linked to a child's day-to-day "needs." What the court said is noteworthy:

> [The father] argues ... that this discretion [to increase a child support award] may be exercised only when there is demonstrated need for the children to receive the additional amount. *We disagree that the sole criterion for determining the support amount for above-guideline-income cases is the need of the child. The children are entitled to share in family income if it grows after the parents separate.* ·See *C.D.[v. N.M.]*, 160 Vt. [495] at 500, 631 A.2d [848] at 851 [(1993)] (amount of child support should be based on policy of meeting needs of children and having them share family income). Thus, the children are entitled to a part of the "fruits of one parent's good fortune after a divorce." *In re Marriage of Nimmo*, 891 P.2d 1002, 1007 (Colo.1995); see also *Galbis v. Nadal*, 626 A.2d 26, 31 (D.C.Ct.App.1993)(children are "entitled to a level of support commensurate with the income and lifestyle of the parents"); *Miller v. Schou*, 616 So.2d 436, 437 (Fla.1993)(child has a right to share in the good fortune of his or her parent).

,*Id.* at 268 (emphasis added).

The Vermont court also recognized that a parent cannot be expected to increase the expenses for a child by spending money he or she does not yet have, as a way to justify a request for an increase in child support. *Id.* at 269 (citing *Nash v. Mulle*, 846 S.W.2d 803, 806 (Tenn.1993)). Significantly, the court also rejected any suggestion that additional child support would merely enrich the mother as "disguised additional maintenance." From the court's perspective, nothing in

the evidence suggested that the mother intended to use the increased support for her own benefit. *Smith*, 684 A.2d at 269.

*Graham v. Graham*, 597 A.2d 355 (D.C.1991), also provides guidance. There, the mother sought to modify a child support award based on the father's increased income, from $100,000 to over $250,000 per year. The trial court determined that the mother had to establish a change in the children's needs to warrant an increase in child support. The Court of Appeals for the District of Columbia disagreed, concluding that, "by itself," a parent's increase in the ability to pay constitutes a proper basis to increase support, "without any proven increase in the needs of the children. . . ." *Id.* at 356. To hold otherwise, it reasoned, would eviscerate the disjunctive standard, which allows for a modification of support based either on a change in needs *or* a change in parental resources. The appellate court added: "By insisting that there could be no increase in support without a commensurate increase in the needs of . . . the children, the trial court effectively nullified [the alternative] prong of [the modification] standard." *Id.* at 357. The court added: "[W]e think it proper that a material increase in the non-custodial parent's income can be the basis for an increase in child support. . . . We think it appropriate that a trial court may act to ensure that where there is a material increase in non-custodial parents' financial resources, that these parents do not increase their own standard of living without also ensuring that their children live as well as they [do]." *Id.* at 358.

*Finley v. Scott*, 707 So.2d 1112 (Fla.1998), is also noteworthy. There, in a paternity action lodged against a professional athlete whose gross monthly income was approximately $266,926, the mother sought child support of $10,000 per month. The mother claimed monthly living expenses of $2128 for herself, the parties' one-year-old child, and another child who was not fathered by the defendant. While recognizing that a child is entitled to share in the good fortune of his or her parent, *id.* at 1114, the trial court ruled that appellant's request for $10,000 in monthly support "had no economic

relevance to the bona fide actual needs of the child." *Id.* at 1114. Accordingly, it declined to award the guideline amount sought by the mother of $10,011 a month. Instead, the trial court awarded the sum of $5000 per month, because it found this amount " 'consistent with the actual and bona fide needs of the minor child and the overall financial circumstances of each parent. . . .' " *Id.* at 1114–15 (citation omitted). The court then ordered the father to pay support of $2000 a month directly to the mother, and $3000 a month to the guardian of the property of the child. *Id.* at 1115.

On appeal, the mother argued that the trial court erred in failing to award the amount of child support that she had requested. She also claimed that the court had no authority to require any of the support payment to be paid to "a guardianship trust." *Id.* at 1115. The father cross-appealed, claiming that the court abused its discretion in ordering payment of $3000 to the guardian, because that sum "was in excess of the child's actual needs." *Id.*

The Florida Supreme Court affirmed the trial court's child support award of $5000 a month. *Id.* at 1116. In regard to the issue of "needs" and standard of living, what the Florida court said is pertinent:

"In this case, the mother is raising the child on a much lower standard of living than would be established by the father, if the child were living at his current lifestyle [as a professional athlete] of $266,926.00 gross income per month. He could well afford, for example, a full time nanny, house-keepers, international travel, residence in a mansion with high attendant expenses, and transportation in expensive automobiles—a portion of which could be allocated to this child. These expenses could easily equate to the $5,000 per month found appropriate by the trial court.

However, the mother is not able, in this case, to live at that standard of living. She must provide for herself and her other two children. They cannot benefit from the child support paid for this child, although the mother tried to do so, and has been properly reprimanded by the trial court for

that effort. *At her standard of living, the trial court found that only $2,000.00 was actually being spent on this child. However, if the father's child support obligations are limited to this level, the child will not share in her father's much higher standard of living and lifestyle. Clearly the 'needs' of this child should not be solely based on what the mother can afford to spend on her, consistent with the mother's much lower standard of living. That also would be inequitable."*

*Id.* at 1117 (citation omitted) (emphasis added).

*Hector v. Raymond,* 692 So.2d 1284 (La.Ct.App.1997), *cert. denied,* 695 So.2d 978 (La.1997), is also illuminating. The case involved an illegitimate child born to a father who was a professional football player. The father earned approximately $150,000 in 1993 as a player with the New York Giants. Based on that income, the father was ordered to provide health insurance and pay monthly child support of $1200, plus $300 a month for a revocable educational trust. When the father was traded to the Detroit Lions in 1996, he received a signing bonus of $1.2 million and a salary of $4.5 million payable over three years. Accordingly, the mother sought an increase in child support, claiming a change in circumstances based on the father's increased income. *Id.* at 1285.

The trial court increased the father's child support payments to $6000 per month, but required $4000 of that sum to "be placed monthly in a court-supervised investment account for [the child] with [appellee] as trustee of the account 'in order to help insure that money for the child's future support will be available should something happen to [appellant].' " *Id.* at 1286. On appeal, the father contended, *inter alia,* that the trial court erred "in increasing his child support obligation to $6,000.00 without considering the evidence of the needs of the minor child and in exceeding the proper scope of child support by allocating part of the money to be deposited in an account for the child's future benefit." *Id.*

The Louisiana court upheld the award of $6000 a month, despite the mother's failure to present evidence that the

child's needs amounted to $6000 per month. *Id.* at 1287–88. The court was satisfied that the support order properly took "into consideration the standard of living that [the child] would be entitled to were he to reside with his father." *Id.* at 1288. Moreover, the court determined that the child was entitled to the same "lifestyle that would be available to a minor child born to a legal union." *Id.* Concluding that the support award of $6000 per month was "just, legal, and proper," it ordered the father to pay that sum as child support, but without any trust restriction. *Id.* at 1287, 1288. What the Louisiana court said, 692 So.2d at 1287, is pertinent:

> This case presents an unusual fact situation.... [The parties] were never married to each other. Thus, [the child] has never enjoyed his father's standard of living because he has never resided with his father. Although [the mother] is now asking for additional support, she testified that she has been able to supply all of [the child's] needs with the $1,200.00 she was previously receiving in child support.... She wants the additional award so that she and [the child] can get a place of their own, and she testified that to do so, she would need a total of approximately $2,500.00 to $3,000.00 a month. The amount requested represents two percent or less of [the father's] current monthly income. The trial court awarded her nearly double the amount that she requested but ordered that two-thirds of the award be placed in trust for the future based on the reasoning that [appellant's] career with the NFL was extremely speculative and could be cut short at any time.

In rejecting the use of a trust vehicle, the court reasoned:

> Obviously, the trial court agreed with [appellee] that "the needs of the minor child in this case are less relevant and the ability of the father to pay is more determinative of the appropriate award of child support." It realized that essentially all of [the child's] needs were currently being satisfied because it only awarded $2,000.00 a month for his current support but attempted to provide [the child] with an insurance policy for the future due to the obvious instability of NFL employment.

While the trial court's approach is reasonable in fact and while we do not disagree that the length of a professional football player's career is uncertain at best, there is no certainty in anyone's life that they will not be disabled and unable to work in the future. Unfortunately, we find no authority in the law for such future planning techniques and choose not to establish a precedent for such decisions in the future. Therefore, we set aside that portion of the trial court's judgment ordering that $4,000.00 per month be placed in a court-supervised investment account.

*Id.* at 1287.

Many other cases support the general proposition that a child's needs are not the exclusive consideration in resolving a request for modification of child support, particularly in an above Guidelines situation. *See, e.g., In re Marriage of Nimmo,* 891 P.2d 1002, 1007 (Colo.1995) (stating that "[t]he guidelines were not enacted to prevent an increase in a child's standard of living by denying a child the fruits of one parent's good fortune after a divorce."); *Pratt v. McCullough,* 100 Ohio App.3d 479, 654 N.E.2d 372, 373 (1995) (recognizing that father's "enormous increase in income due to his lottery winnings constitutes a change of circumstance substantial enough to require a modification of the amount of the existing child support order."; "[A]n increased economic need is not a requirement for obtaining an increase in child support . . . ."), *appeal denied,* 72 Ohio St.3d 1540, 650 N.E.2d 481 (1995); *Miller v. Schou,* 616 So.2d 436, 438 (Fla.1993) ("[T]he need of the child is only one of several factors to be considered in determining an appropriate amount of support"; "Without knowing [the father's] financial status it would be impossible for the trial court to determine the appropriate amount of the increase in support to allow . . . [the] child to share his good fortune."); *Ball v. Wills,* 190 W.Va. 517, 438 S.E.2d 860, 866 (1993) (concluding that, with respect to child support, trial court erred in failing to consider father's increased income, even though all of the children's needs had been met). *See also Moulds v. Bradley,* 791 So.2d 220, 226 (Miss.2001) ("The marked disparity between [the father's] income and the

amount he is required to pay in child support warrants that this issue be revisited by the Chancellor."); *In Re Marriage of Bohn,* 8 P.3d 539, 542 (Colo.Ct.App.) (stating that child "was entitled to benefit from her father's windfall" of lottery winnings; "Nothing in the child support statute precludes the trial court from ordering a support payment that exceeds the known needs of the child."), *cert. denied,* 2000 Colo. LEXIS 1046 (Colo.2000); *Connell v. Connell,* 313 N.J.Super. 426, 712 A.2d 1266, 1270 (App.Div.1998) (concluding that father's inheritance warranted modification of child support); *Green v. Scott,* 687 So.2d 655, 658 (La.Ct.App.1997) (upholding increase in child support after father won lottery).

In sum, although the decision as to a modification of child support is a discretionary one, the decision must be founded on the application of correct legal principles. Because the trial court's ruling suggests that it did not recognize the father's substantial increase in income as an independent, valid ground on which the court, in its discretion, could have increased child support, we vacate the Order and remand for further proceedings. We express no opinion, however, as to how the court should resolve the motion.

## III.

As we noted, the court rejected some of the child's expenses as unnecessary and inappropriately extravagant. It was understandably offended by what it perceived as maternal decadence.[9]

---

9. The concurring opinion criticizes the majority based on its belief "that the majority suggests that a trial court must accept extravagance or over-indulgence [even] where it believes that such conduct is not in the best interest of the child...." The concurrence has misconstrued the majority opinion.

It is axiomatic that the chancellor's decision must be predicated on the best interest of the child. Moreover, the chancellor is vested with the responsibility to determine what is in the child's best interest. Therefore, the chancellor was entitled to determine that appellant's proposed expenditures for the child are so excessive and indulgent that they are not in the child's best interest.

As one court has put it, when a case involves one parent who is unusually rich, " '[t]he crux of the difficulty is settling on *whose* standard of living determines the "needs" of this child.' " *Finley v. Scott, supra,* 707 So.2d at 1117 (citation omitted). Numerous decisions from other jurisdictions reflect the view that, with respect to child support, "need" is an elastic concept that varies with the particular economic circumstances of the parties. We turn to consider some of these cases, as they may provide some guidance to the court on remand.

In *Miller v. Schou, supra,* 616 So.2d 436, the Florida Supreme Court explained that, "consistent with an appropriate life style," *id.* at 439, a court does not award support to the child of a multi-millionaire in the same amount as it would award when "the paying parent makes a modest living," even though "technically the child's basic survival needs would be the same in each case...." *Id.* at 438. As the court observed, "the determination of 'need' in awarding child support takes into account more than just the basic necessities of survival.... The child of a multi-millionaire would be entitled to share in that standard of living ... and would accordingly be entitled to a greater award of child support to provide" for various luxuries, "even though provision for such items would not be ordered in a different case." *Id.* (internal citation omitted).

*Harris v. Harris,* 168 Vt. 13, 714 A.2d 626 (1998), is to the same effect. There, the father, a physician, argued that the court erred in awarding child support in excess of the children's needs. The court recognized that the concept of need varies with the family's standard of living. *Id.* at 632. Thus, even if the mother could have met the children's "basic needs"

---

Child-rearing philosophies are deeply personal, however. Within the parameters of the law, parenting is subject to limited governmental intrusions. In this case, we have merely attempted to point out that, within reason, the extent to which material indulgences are appropriate for a child is a personal decision that generally falls within the domain of parental discretion, and is, of course, affected by the parents' economic circumstances.

on "less support," the court said that she was not precluded from receiving an increase in support. *Id.* at 633. The court observed: "Reasonable needs of affluent children may include items that would be frivolous for children of less-well-off parents." *Id. See also Hubner v. Hubner*, 94 Cal.App.4th 175, 114 Cal.Rptr.2d 646, 655 (2001) (recognizing that trial court's findings as to the child's needs may be affected by whether a parent "is merely rich or is very rich"), *review denied,* 2002 Cal. LEXIS 1712 (Cal. March 13, 2002).

The cases cited above recognize that the concept of "need" is relative, almost metaphysical, and varies with the particular circumstances of the people involved, as well as their culture, values, and wealth. To be sure, many people, adults and children alike, have far more than they truly "need" to survive, or even to live comfortably. On the other hand, there is virtually no limit to the luxuries that many extremely wealthy celebrities seem to enjoy regularly. Even among middle class populations, there is a range of tastes with varying costs. While some Marylanders are amply satisfied with a vacation in Ocean City, others prefer to vacation in places like Martha's Vineyard, despite the fact that both beaches front on the Atlantic Ocean. Simply put, given a choice between rhinestones and rubies, many people opt for the latter if they can afford to do so.

In the court's view, the child simply did not "need" more than $42,000 a year in child support. Therefore, it was of no moment to the court that appellee had agreed to pay that sum when his earnings were about one third of what he was earning at the time of the modification hearing.[10] A child of a multi-millionaire generally expects a lifestyle of unusual privilege and advantage. Indeed, the Court of Appeals has recognized that there are a "multitude of different options for income expenditure available to the affluent." *Voishan,* 327 Md. at 328, 609 A.2d 319. Similarly, we have said that

---

**10.** Exclusive of the cost of private school tuition, appellee's current child support payment of $42,000 a year represents less than 2% of his current income.

children of wealth "are entitled to every expense reasonable for a child of . . . affluence." *Bagley*, 98 Md.App. at 38, 632 A.2d 229. Thus, child care that is not work related, private school, summer camp, lessons, luxury vacations, designer clothes and shoes, toys, travel, cultural and recreational activities, and other material privileges are among the extravagances enjoyed by families of substantial wealth.

### IV.

As we indicated, in its ruling the trial court relied, in part, on the fact that the parties had never been married to each other. As a result, the court observed that the child was not just accustomed to her father's wealthy economic status.

A child's entitlement to support does not turn on the parents' marital status at the time of the child's birth, nor may the court put a child at an economic disadvantage merely because the parents had never been united in marriage. *Jackson*, 145 Md.App. at 92–93, 801 A.2d 1080. As with children of divorce, children born out-of-wedlock are entitled to "fairness and equity" in regard to child support. *W.S. v. X.Y.*, 290 N.J.Super. 534, 676 A.2d 179, 182 (App.Div.1996).

Regardless of whether a child is born out-of-wedlock or to parents whose marriage ended in divorce, every child is entitled to a level of support commensurate with the parents' economic position. A system that rewards those children whose parents were once married to each other, or who had at least lived together, would contravene the objective of the Guidelines "to achieve equity and consistency in child support awards." *Jackson*, 145 Md.App. at 92, 801 A.2d 1080. It follows that, in ascertaining the appropriate level of support in an above Guidelines case, the court's decision should not turn on the fact that the child never lived with the parents as part of one household.

What we said in *Jackson*, 145 Md.App. at 92, 801 A.2d 1080, is pertinent here:

Under the [I]ncome [S]hares [M]odel, the child is entitled to a standard of living that corresponds to the economic posi-

tion of the parents. The child of a millionaire ought to have a lifestyle of advantage....

\* \* \*

We see no sound public policy in adopting a system of calculating child support in an above guidelines case that rewards a child whose parents were married, but denies equal advantages and economic opportunities to a child whose parents were not married.

Based on the foregoing, it would be improper for the court to fashion a child support award based on the fact that the child had never enjoyed living with the parties as part of a traditional family unit, and was instead used to two parents of unequal wealth. To the extent that the court's ruling was predicated on the view that appellant was not entitled to an increase in support because the parties never resided together, the court erred.

## V.

The court below was evidently concerned that appellant would personally benefit from a more generous award of support. A custodial parent of a child whose non-custodial parent is extremely wealthy will inevitably reap some benefits. *Smith v. Stewart, supra,* 684 A.2d at 269 (recognizing that "increased child support necessarily has an incidental benefit for the custodial parent"). To illustrate, if the wealth of the father justifies the child's residence in a well appointed home in an upscale neighborhood, with a large screen television and a playroom, as well as luxurious vacations, the child obviously cannot live in the house alone or travel by herself. In this case, however, there was no evidence that appellant had misappropriated the child's money for herself, or that she sought the increase as a way to enrich herself.

In fashioning its decision, the court was also concerned that, because of the nature and unpredictability of appellee's career, appellee's current wealth may be short lived. Given that uncertainty, the court decided to allow appellee to retain most of his money for the proverbial rainy day.

Although appellee has a limited career expectancy, we do not believe that it is appropriate for a court to make a child support determination on the basis of events that have not yet occurred. Life is, after all, full of uncertainty. Further, the court's reasoning conflicts with the principle that a child is entitled to a level of support commensurate with the parents' economic position. As appellant observes, it is "precisely because the father's long range earning potential ... is comparatively short, that there is ... more justification for presently setting aside substantial funds for child support." Put another way, given that appellee's resources may, indeed, diminish in the future, it is appropriate for the court to allow the child to share the father's wealth while it exists.

Moreover, if and when appellee experiences a reduction in income, as the court anticipated, he would be entitled to file for a downward modification of his child support obligation. At that time, the court would be able to examine and consider all the relevant facts and circumstances, and set the appropriate child support award. *See Unkle*, 305 Md. at 597, 505 A.2d 849 (rejecting "*in futuro* modification" of child support). Because that situation had not materialized as of the time of the hearing, we conclude that the court's decision as to child support should have been made on the basis of the father's present economic status.

We also agree with appellant that the court's analysis was flawed to the extent that it relied on the parties' 1998 Agreement as a basis to deny the request for an increase in child support. That Agreement did not preclude modification of child support. Moreover, since the time that the Agreement was executed, the father's income has nearly tripled. In light of that circumstance, the court could have exercised its discretion to modify the child support obligation.

## CONCLUSION

In cases involving an increase in parental income of the magnitude present here, numerous courts have rejected an approach to modification of child support that links an in-

crease in support to an itemized increase in the child's needs or a demonstrated increase in child-related expenses. Based on the disjunctive standard applicable to a request for modification of child support, the circuit court erred to the extent that it considered dispositive the mother's failure to prove a change in the child's needs and expenses. In doing so, the court overlooked the alternative prong of the material change in circumstances standard, which permits a discretionary modification of child support based on a change in parental income.

Accordingly, for all of the reasons articulated above, we shall vacate the court's order and remand for further proceedings. On remand, the court should consider and apply the disjunctive standard that governs a modification request. We underscore, however, that we express no opinion as to whether any change in child support is appropriate.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**

Concurring Opinion by PAUL E. ALPERT, J. (Retired, Specially Assigned).

I concur in the result but seriously question some of the reasoning and conclusions declared by the majority.

At part II of this opinion, the majority opines:

Based on our review of the court's ruling, we cannot determine whether the court recognized the disjunctive nature of the standard applicable to a motion for modification of child support. Although the court found a material change of circumstances based on appellee's income, it never articulated the elements of a material change in circumstance. Nor did it acknowledge that a substantial change in income, by itself, could support a modification. Instead, it appears that the court believed that the modification standard is a conjunctive one, which required appellant

to demonstrate a change in financial circumstances *and* a change in the child's needs.

Op. at 22.

\* \* \*

Because the court did not fully consider the importance of the change in the father's economic position as an alternative basis on which to modify support, we shall vacate the judgment. . . .

Op. at ——.

I disagree with the majority's conclusion above stated. Implicit in the trial judge's reasoning (*see* pages 7–10 of the opinion) is the recognition that the court could award an increase in child support but, for the reasons stated, chose not to do so. A reasonable reading of the trial court's analysis indicates that the judge believed that an increase in the wealth of a wealthy dad did not "automatically" entitle the child to an increase in support. A judge is presumed to know the law and "is presumed to have performed his duties properly." *Lapides v. Lapides,* 50 Md.App. 248, 251, 437 A.2d 251 (1981).

To the extent that the majority suggests that a trial court must accept extravagance or over-indulgence where it believes that such conduct is not in the best interest of the child, I strongly disagree. *See* part III of the opinion.

I do, however, agree with the majority that it is not appropriate for a court to limit the amount of child support on the basis that the appellant has a limited career expectancy. While I disagree with this aspect of the trial judge's decision, it does tend to indicate that the trial judge recognized that he had a choice, i.e., he could increase child support based on appellant's substantiated increase in income but chose not to do so, theorizing that the increase would be short lived. In any event, if and when material circumstances change, appellant can then seek modification. While I do not suggest the trial court should increase the amount of child support because of the increased income, I would remand because the trial court should not have considered appellee's limited career expectancy.